JASON S. HARTLEY (SBN# 192514)
JASON M. LINDNER (SBN# 211451)
STUEVE SIEGEL HANSON LLP
550 West C Street, Suite 1750
San Diego, CA 92101
Tel: 619-400-5822
Fax: 619-400-5832
*hartley@stuevesiegel.com*
*lindner@stuevesiegel.com*

*Attorneys for Plaintiff*

1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

8
9

| | |
|---|---|
| INDUCTORS, INC., on behalf of itself and others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| vs. | JURY TRIAL DEMANDED |
| KEMET CORPORATION; KEMET ELECTRONICS CORPORATION; MURATA MANUFACTURING CO., LTD.; MURATA ELECTRONICS NORTH AMERICA, INC.; NEC CORPORATION; OKAYA ELECTRIC INDUSTRIES CO, LTD; OKAYA ELECTRIC AMERICA INC.; PANASONIC CORPORATION; PANASONIC CORPORATION OF NORTH AMERICA; PANASONIC ELECTRONIC DEVICES CO. LTD; PANASONIC ELECTRONIC DEVICES CORPORATION OF AMERICA; SANYO ELECTRIC CO. LTD.; SANYO NORTH AMERICA CORPORATION; SUMIDA CORPORATION; SUMIDA ELECTRIC CO., LTD.; SUMIDA AMERICA COMPONENTS, INC.; TAIYO YUDEN CO., LTD.; TAIYO YUDEN (U.S.A.) INC.; TDK CORPORATION; TDK-EPC CORPORATION; TDK CORPORATION OF AMERICA; TDK U.S.A. CORPORATION; TOKIN AMERICA, INC., and TOKIN CORPORATION, | |
| Defendants. | |

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff Inductors, Inc., individually and on behalf of the proposed Class, by and through its counsel, for its Complaint against defendants KEMET Corporation; KEMET Electronics Corporation; Murata Manufacturing Co., Ltd.; Murata Electronics North America, Inc.; NEC Corporation; Okaya Electric Industries Co. Ltd.; Okaya Electric America, Inc.; Panasonic Corporation; Panasonic Corporation of North America; Panasonic Electronic Devices Co. Ltd; Panasonic Electronic Devices Corporation of America; SANYO Electric Co. Ltd.; SANYO North America Corporation; Sumida Corporation; Sumida Electric Co., Ltd.; Sumida America Components, Inc.; Taiyo Yuden Co., Ltd.; Taiyo Yuden (U.S.A.) Inc.; TDK Corporation; TDK-EPC Corporation; TDK Corporation of North America; TDK U.S.A. Corporation; TOKIN America, Inc.; and TOKIN Corporation (collectively "Defendants") hereby states and alleges as follows:

## **NATURE OF THE ACTION**

1.      This action arises from a conspiracy among Defendants to raise, fix, stabilize, or maintain prices in the market for Inductors from as early as January 1, 2003 through December 31, 2016 (the "Class Period").  Inductors, as described more fully herein, are electrical circuit parts that use magnetic fields to store and regulate the flow of electricity.

2.      Plaintiff brings this action to (i) recover treble damages, attorneys' fees, litigation expenses, and court costs, and (ii) secure injunctive relief for violations of Section 1 of the Sherman Act of 1890 ("Sherman Act"), 15 U.S.C. § 1, pursuant to Sections 4 and 16 of the Clayton Act of 1914 ("Clayton Act"), 15 U.S.C. §§ 15 and 26.

3.      As alleged more fully below, prices for inductors dropped precipitously before the start of the Class Period, in part because of the enactment of the multinational Information Technology Agreement ("ITA") which eliminated tariffs on trade of various electronic components, including Inductors.  Beginning at least

as early as January 2003, in an effort to combat the prospect of diminishing profits, Defendants conspired to raise, fix, stabilize, and maintain prices in the market for Inductors sold in the United States. As a direct and proximate result of Defendants' cartel activities, Plaintiff was overcharged by Defendants for Inductors.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the subject matter of this action pursuant to Section 4(a) and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and 28 U.S.C. §§ 1331 and 1337.

5.      Defendants engaged in conduct both inside and outside the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States, and upon import trade and commerce with the United States.

6.      Venue is proper in this District pursuant to Sections 4(a) and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. §§ 1391 (b), (c), and (d) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below was carried out in this District, and one or more Defendants reside, are found, have agents, are licensed to do business, are doing business, or transact business in this District.

7.      This Court has personal jurisdiction over each Defendant because each Defendant: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of Inductors throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; or (d) was engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout

the United States, including in this District.

## THE PARTIES

### A.    Plaintiff

8.    Plaintiff Inductors, Inc. is a California corporation with its principal place of business in Irvine, California.  During the Class Period, Plaintiff purchased Inductors directly from one or more Defendants, and was injured in its business or property by reason of the antitrust violations alleged in this complaint.

### B.    Murata Defendants

9.    Murata Manufacturing Co., Ltd. ("Murata Manufacturing") is a Japanese corporation with its principal place of business located at 10-1, Higashikotari 1-chome, Nagaokakyo-shi, Kyoto 617-8555, Japan.  Murata Manufacturing manufactures Inductors and, directly and/or through its wholly-owned subsidiaries, marketed and sold Inductors in the United States during the Class Period.  In 2011, Murata Manufacturing characterized itself in a press release as "the world's number one supplier of passive electronic components."

10.    Murata Manufacturing acquired controlling interest in Inductor manufacturer TOKO Inc. in March of 2014, in order to "allow Murata and TOKO to deliver next-generation power inductor products…."  During the Class Period, TOKO Inc. had substantial sales of Inductors into the United States.  As of the filing of this complaint, all of TOKO Inc.'s websites now redirect to Murata Manufacturing's homepage.  Plaintiff alleges, on information and belief, that the antitrust liability for TOKO's sales during the Class Period has been transferred to Murata Manufacturing.  To the extent such liabilities are reserved elsewhere, Plaintiff reserves the right to amend this complaint to include the proper entity for TOKO Inc.'s liabilities at a later date.

11.    Murata Electronics North America ("Murata NA") is a Texas

1    corporation with its principal place of business at 2200 Lake Park Drive, Smyrna,

2    GA, 30090-7604.  Murata NA, directly and/or through its subsidiaries or agents,

3    marketed and sold Inductors in the United States during the Class Period.

4        12.    Murata Manufacturing and Murata NA will be referred to collectively

5    herein as "Murata."

6        **C.    Panasonic Defendants**

7        13.    Panasonic Corporation is a Japanese corporation with its headquarters

8    at 1006, Oaza Kadoma, Kodoma-shi, Osaka 571-8501.  Panasonic Corp., directly

9    and/or through its wholly-owned subsidiaries, manufactured, marketed, and sold

10   Inductors in the United States during the Class Period.

11       14.    In part, Panasonic Corporation manufactured and sold Inductors

12   through Panasonic Electronic Devices Co, Ltd., a former subsidiary that was merged

13   into Panasonic Corp. in April of 2012.  Plaintiff alleges, on information and belief,

14   that the antitrust liability for Panasonic Electronic Devices Co, Ltd.'s sales during

15   the Class Period has been transferred to Panasonic Corporation.  To the extent such

16   liabilities are reserved elsewhere, Plaintiff reserves the right to amend this complaint

17   to include the proper entity for those liabilities at a later date.

18       15.    Panasonic Corporation of North America ("Panasonic NA") is a

19   Delaware corporation with its principal place of business at 828 McCarter Highway,

20   Newark, NJ 07102.  Panasonic NA is a wholly-owned subsidiary of Panasonic

21   Corporation.  Panasonic NA, directly and/or through its subsidiaries or agents,

22   marketed and sold Inductors in the United States during the Class Period.

23       16.    Panasonic Corporation, Panasonic NA, and Panasonic Electronic

24   Devices Co, Ltd. are referred to collectively herein as "Panasonic."

25       17.    Defendant SANYO Electric Co., Ltd. ("SANYO Co."), is a Japanese

26   corporation and, as of December 2009, a wholly owned subsidiary of Panasonic

27   Corp. SANYO Co.'s principal place of business is located at 15-5, Keihan-Hondori,

28

CLASS ACTION COMPLAINT FOR DAMAGES

2-Chome, Moriguchi City, Osaka 570-8677, Japan. During the Class Period, SANYO Co. either directly or through its business units, subsidiaries, agents, or affiliates, or those of its corporate parent—sold and distributed to United States purchasers Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent.

18.     Defendant SANYO North America Corporation ("SANYO NA"), a Delaware corporation, is a wholly owned subsidiary of SANYO Co. SANYO NA's principal place of business is located at 2055 Sanyo Avenue, San Diego, California 92154. During the Class Period, SANYO NA, either directly or through its business units, subsidiaries, agents, or affiliates, or those of its corporate parent—sold and distributed to United States purchasers Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent.

19.     Panasonic Corporation, Panasonic NA, Panasonic Electronic Devices Co, Ltd., SANTO, and SANTO NA are referred to collectively herein as "Panasonic."

**D.     <u>Okaya Defendants</u>**

20.     Defendant Okaya Electric Industries Co., Ltd. ("Okaya Co.") is a Japanese corporation with its principal place of business located at 16-9, Todoroki 6 chome, Setagaya-ku, Tokyo 158-8543, Japan.  During the Class Period, Okaya Co. manufactured Inductors and, directly and/or through its wholly-owned subsidiaries, marketed and sold Inductors in the United States during the Class Period.

21.     Defendant Okaya Electric America Inc. ("Okaya America"), an Indiana corporation, is a wholly-owned subsidiary of Okaya Co. with its principal place of business located at 52 Marks Road, Suite 1, Valparaiso, Indiana, 46383. During the Class Period, Okaya America—either directly or through its business units, subsidiaries, agents, or affiliates, or those of its corporate parent—sold and distributed to United States purchasers Inductors manufactured by business units,

subsidiaries, agents, or affiliates of its corporate parent, Okaya Co.

22.     Okaya Co. and Okaya America are together referred to herein as "Okaya."

**E.      Sumida Defendants**

23.     Sumida Electronic Components, Co., Ltd. ("Sumida Electronic") is a Japanese corporation with its corporate headquarters at Harumi Island Triton Square Office Tower X 14/F,1-8-10 Harumi, Chuo-Ku, Tokyo, 104-8547.  Sumida Electronic, directly and/or through its wholly-owned subsidiaries, manufactured, marketed, and sold Inductors in the United States during the Class Period.

24.     Sumida America Components Inc. ("Sumida America") is a Delaware corporation with a principal place of business at 1251 N Plum Grove Road, Suite 150, Schaumburg, Illinois 60173.  Sumida America is a wholly-owned subsidiary of Sumida Electronic.  Sumida America, directly and/or through its subsidiaries or agents, marketed and sold Inductors in the United States during the Class Period.

25.     Sumida Electronica and Sumida America are collectively referred to herein as "Sumida."

**F.      Taiyo Yuden Defendants**

26.     Taiyo Yuden Co., Ltd. is a Japanese corporation with its headquarters at 2-7-19, Kyobashi, Chuo-ku, Tokyo 104-0031, Japan.  Taiyo Yuden Co., Ltd, directly and/or through its wholly-owned subsidiaries, manufactured, marketed, and sold Inductors in the United States during the Class Period.

27.     Taiyo Yuden (U.S.A.) Inc. ("Taiyo USA") is an Illinois corporation with its principal place of business located at 10 North Martingale Road, Suite 575, Schaumburg, Illinois 60173. Taiyo USA also maintains offices in Dallas, San Diego, San Jose, and Boston.  Taiyo USA is a wholly-owned subsidiary of Taiyo Yuden Co., Ltd.  Taiyo USA, directly and/or through its subsidiaries or agents, marketed and sold Inductors in the United States during the Class Period.

28.    Taiyo Yuden Co., Ltd and Taiyo USA are collectively referred to herein as "Taiyo Yuden."

**G.    TDK Defendants**

29.    TDK Corporation is a Japanese corporation with its headquarters at 3-9-1 Shibaura, Minato-ku, Tokyo 108-0023.  TDI Corporation, directly and/or through its wholly-owned subsidiaries, manufactured, marketed, and sold Inductors in the United States during the Class Period.

30.    TDK-EPC Corporation ("TDK-EPC") is a Japanese corporation which is headquartered with TDK Corporation at 3-9-1 Shibaura, Minato-ku, Tokyo 108-0023, Japan.  TDK-EPC was founded on October 1, 2009 from the combination of the passive components businesses of TDK Corporation and the EPCOS Group.  TDK-EPC is the manufacturer of TDK corporation's electronic components, modules and systems. TDK-EPC, directly and/or through its subsidiaries or agents, marketed and sold Inductors in the United States during the Class Period.

31.    TDK U.S.A. Corporation ("TDK USA") is a New York corporation with its headquarters at 525 RXR Plaza, Uniondale NY, 11556.  TDK USA is a wholly-owned subsidiary of TDK Corporation.  TDK USA, directly and/or through its subsidiaries or agents, marketed and sold Inductors in the United States during the Class Period.

32.    TDK Corporation of America (TDK America) is an Illinois corporation with its principal place of business at 475 Half Day Rd., Lincolnshire, IL 60069-2934.  TDK America, directly and/or through its subsidiaries or agents, marketed and sold Inductors in the United States during the Class Period.

33.    TDK Corporation, TDK-EPC, TDK USA, and TDK America are collectively referred to herein as "TDK."

**H.    TOKIN Defendants**

34.    Defendant KEMET Corporation ("KEMET Corp.") is a Delaware

CLASS ACTION COMPLAINT FOR DAMAGES

corporation with its principal place of business located at 2835 Kemet Way, Simpsonville, South Carolina 29681. KEMET Corp., directly and/or through its subsidiaries or agents, manufactured, marketed, and sold Inductors in the United States during the Class Period.

35.    Defendant KEMET Electronics Corporation ("KEMET Electronics") is a Delaware corporation and a wholly-owned subsidiary of KEMET Corp., with its principal place of business located at 2835 Kemet Way, Simpsonville, South Carolina 29681. KEMET Electronics, directly and/or through its subsidiaries, corporate parent, or agents, manufactured, marketed and sold Inductors in the United States during the Class Period.

36.    KEMET Corp. is the holding company of KEMET Electronics and has no business of its own.  KEMET Electronics is the alter ego of KEMET Corp. Although technically separate corporate entities, KEMET Corp. and KEMET Electronics are functionally a single economic and operational entity.

37.    KEMET Corp. and KEMET Electronics are managed by a single set of officers. The following individuals, for example, concurrently hold or held the same executive positions with both KEMET Corp. and KEMET Electronics: Mr. Per-Olof Loof (CEO and Director), Mr. William M. Lowe (Executive Vice President and Chief Financial Officer), Mr. R. James Assaf (Senior Vice President, General Counsel and Secretary), Ms. Susan B. Barkal (Senior Vice President and Chief of Staff ), Mr. John Powers (Senior Vice President, Global Supply Chain & Chief Procurement), and Ms.Monica Highfill (Vice President Sales – Americas). KEMET Corp. did not recognize the corporat distinction between KEMET Corp. and KEMET Electronics and frequently used those corporate names interchangeably to refer to the signatory of particular agreements, often simply referring to the company as "KEMET."

38.    KEMET Corp. and KEMET Electronics are together referred to herein

as "KEMET."

39.     Defendant TOKIN Corporation, an entity known throughout the Class Period known as NEC TOKIN Corporation ("NEC TOKIN Corp."), is presently a wholly-owned subsidiary of Defendant KEMET Electronics. TOKIN Corp. has its principal place of business located at 7-1, Kohriyama 6-chome, Taihaku-ku, Sendai-shi, Miyagi 982-8510, Japan. In 2013, Defendant KEMET Electronics acquired a 34% interest in NEC TOKIN Corp. In 2017, KEMET Electronics completed its acquisition of NEC TOKIN Corp.

40.     NEC TOKIN Corp. directly and/or through its wholly-owned subsidiaries, manufactured, marketed, and sold Inductors in the United States during the Class Period

41.     Defendant TOKIN America, Inc., an entity formerly and at all times during the Class Period known as NEC TOKIN America, Inc. ("NEC TOKIN America"), is a California corporation and wholly-owned subsidiary of TOKIN Corp. with its principal place of business located at 2460 North First Street, Suite 220, San Jose, California 95131. During the Class Period, NEC TOKIN America, either directly or through its business units, subsidiaries, agents, or affiliates, or those of its corporate parent—sold and distributed to United States purchasers Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent.

42.     TOKIN Corp. and TOKIN America are together referred to herein as "NEC TOKIN," and together with KEMET, the entities are referred to herein as "KEMET/TOKIN."

43.     Defendant NEC Corporation ("NEC Corp.") is a Japanese corporation with its principal place of business located at 7-1, Shiba 5-chome Minato-ku, Tokyo 108-8001. Plaintiff seeks recovery from NEC Corp. to the extent that any liabilities for NEC TOKIN's Class Period activities remain with Defendant NEC Corporation.

## AGENTS AND CO-CONSPIRATORS

44.    Each Defendant acted as the principal of, or agent for, all other Defendants with respect to the acts, violations, and common course of conduct described in this complaint.

45.    Various other persons, firms, companies, and corporations not named as Defendants knowingly and willingly conspired with Defendants, and performed acts and made statements in furtherance of the conspiracy and in furtherance of the anticompetitive conduct.

46.    The acts alleged to have been done by any Defendant or co-conspirator were authorized, ordered, or done by its directors, officers, managers, agents, employees, or representatives while actively engaged in the management, direction, or control of such Defendant's or co-conspirator's affairs.

## INTERSTATE TRADE AND COMMERCE

47.    Defendants are the leading manufacturers of Inductors sold in the United States.

48.    The referenced Inductors are produced by Defendants or their affiliates in either the United States or overseas.

49.    During the Class Period, Defendants, directly or through one or more of their affiliates, sold Inductors throughout the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this judicial District.

50.    The activities of Defendants and their co-conspirators were within the flow of, and intended to, and did, have a substantial effect on interstate commerce in the United States.

51.    Defendants' and their co-conspirators' conduct, including the marketing and sale of Inductors, took place within, and has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon

CLASS ACTION COMPLAINT FOR DAMAGES

interstate commerce within the United States and upon import commerce with foreign nations.

52.     The restraints alleged in this complaint have directly and substantially affected interstate commerce in that Defendants have deprived Plaintiff of the benefits of free and open competition in the purchase of Inductors within the United States.

53.     Defendants' agreement to inflate, fix, raise, maintain, or artificially stabilize prices of Inductors, and their actual inflating, fixing, raising, maintaining, or artificially stabilizing Inductor prices, were intended to have, and had, a direct, substantial, and reasonably foreseeable effect on United States commerce and on import trade and commerce with the United States.

## FACTUAL ALLEGATIONS

### A.    Background

54.     Inductors are passive electronic components that are designed to resist changes in electronic currents.  Current passing through an Inductor will produce a magnetic field. A changing magnetic field induces a voltage which opposes the field-producing current. This property of impeding changes of current is known as inductance.

55.     Because of the importance of regulating and smoothing electronic currents, Inductors have a large variety of applications, including filters for analog circuits and signal processing, sensors, transformers, motors, and energy storage. Such applications are used, for example, in the automotive, industrial, military and defense, transmission and distribution, telecommunications, and consumer electronics industries.

56.     There are several types of inductors that serve these various applications, including choke, variable inductors, coupled inductors, multilayered inductors, power inductors, and surface mount inductors. All discrete inductors,

1   which are inductors that are mounted on printed circuit boards, are the subject of

2   this litigation and are referred to herein as "Inductors."

3        57.    An Inductor can be made of various materials, and are often

4   categorized by their core materials, including laminated core, toroidal core, air core,

5   ferromagnetic core, and ceramic core Inductors.

6        58.    In general, the market for inductors is very large.  The overall inductor

7   market was estimated at between $2.96 to $3.01 billion in 2015, and is expected to

8   reach approximately $3.94 billion by 2022.

9        59.    Defendants have, and have had at all times throughout the Class Period,

10  a dominant market share of this multi-billion dollar market.

11      **B.**    **The ITA Sparked the Beginning of Defendants' Conspiracy.**

12       60.    On December 13, 1996, an Information Technology Agreement

13  ("ITA") was reached through a "Ministerial Declaration of Trade in Information

14  Technology Products" at the first World Trade Organization ("WTO") Conference,

15  held in Singapore.

16       61.    The ITA was the first, and most significant, tariff liberalization

17  arrangement negotiated in the WTO after its establishment in 1995.  It mandated the

18  elimination of import duties on various technological products, including Inductors.

19  The ITA requires each participant to eliminate and bind customs duties at zero for

20  all products specified in the Agreement.

21       62.    The ITA was initially subscribed to by 29 members, including Japan

22  and the United States.  Participation quickly increased over the next few years, and

23  in 2003, China joined the ITA as well.

24       63.    To give an example on how significant the effect of these tariff

25  removals are, the WTO estimates that the ITA "led to the elimination of import

26  duties on products which in 2013 accounted for an estimated US$1.6 trillion, almost

27  three times as much as when it was signed in 1996."  Thus, even in 1996, the ITA

28

1  would have eliminated over $530 billion in import duties globally.

2      64.     The enactment of the ITA raised the specter of increased competition in

3  the Inductors market from non-Japanese foreign suppliers such as Korea, Taiwan,

4  and China.  In addition, a global recession slowed sales in 2001.  Accordingly,

5  United States import prices of inductors plummeted between 1997 and 2003, with a

6  particularly severe drop in 2003, as shown by U.S. Bureau of Labor import

7  statistics:



Source: U.S. Bureau of Labor Statistics

22      65.     Yet, as shown above, prices rapidly surged back, and began steadily

23  rising to heights never seen before.  In fact, even in the face of a global recession

24  between 2008 to 2009 (often called the "Great Recession" and shown on this chart

25  in a grey stripe), prices not only stayed at their inflated levels, but actually spiked

26  even higher, indicative of a further conspiratorial event.

27      66.     Normal market factors cannot explain these rising prices.  For example,

CLASS ACTION COMPLAINT FOR DAMAGES

data shows that raw material prices for Inductors were flat or declining throughout most of the 2010 to 2016 period, aside from a brief spike in late 2010, yet Inductor prices were sharply and continually rising:



MONTHLY PASSIVE COMPONENT INDEX
Average Collective Pricing For Passive Electronic Components Raw Materials By Month: 2010-2014



Demand also does not explain the rising prices, as consumption of passive electronic components remained relatively flat throughout the 2007-2016 period, with only a general rise in communications applications throughout 2014-2016 – a time when prices actually seemed to decline before rising again:



As shown above, demand for Inductors in several applications such as consumer audio-visual applications and computers fell during the Class Period, in part due to advances in micro-technology such as semiconductors and digital circuits.

67.    The above data shows that prices rose at a significant rate during the Class Period following the initial price crisis. Yet, raw material prices and demand were flat or declining. There is no cognizable competitive market reason for these pricing trends.

68.    These market statistics demonstrate that Defendants, in the face of plummeting prices after the ITA, agreed among themselves to raise and maintain pricing of Inductors at supra-competitive levels, as well as to exchange confidential information. Defendants were aware that with their combined market power, they could raise and maintain prices, and through this collusion actually did raise prices throughout the Class Period.

C.    **Prior Antitrust Cases in Related Markets and Current DOJ Investigation Further Evidence the Propensity for Collusion in this Market.**

69.    The above market conclusion is supported by the investigation by the Department of Justice into the Inductors industry.  On January 4, 2018, it was reported that electronics manufacturers were subpoenaed by United States antitrust prosecutors as part of a price-fixing investigation in the Inductors market.  Plaintiff alleges, upon information and belief, that the Department of Justice's investigation into Inductors was initiated by information that the DOJ found during its investigation into the related capacitor and resistors markets.

70.    Capacitors and Inductors are closely related passive components. Many companies that manufacture, sell, and distribute capacitors also manufacture, sell, and distribute Inductors. In fact, each and every named Defendant company or group of companies manufactures, sells, and distributes capacitors as well as Inductors.

71.    During the Class Period, capacitor manufacturer companies, including several named Defendants, engaged in a longstanding anticompetitive conspiracy to fix, raise, stabilize, and maintain the prices of capacitors in violation of Section 1 of the Sherman Act. Specifically, Panasonic Defendants, Sanyo Defendants, NEC TOKIN Defendants, Kemet Defendants, and Okaya Defendants ("Common Defendants") are or were named defendants in the corresponding price-fixing class action litigation, *In re Capacitors Antitrust Litigation*, No. 3:14-cv-03264-JD (N.D. Cal filed July 18, 2014).

72.    The capacitors industry has also been the subject of criminal prosecution, resulting in at least eight criminal antitrust defendants pleading guilty in what the DOJ called "a long-running conspiracy to fix the price of a critical component in electronic devices used by millions of American consumers."  It has

been reported that Panasonic was a leniency applicant in the capacitors criminal investigation.

73.    The DOJ also indicted at least nine individual officers, managers, and employees, including at least one manager of Common Defendant NEC TOKIN, for violations of Section 1of the Sherman Act based on their participation in the capacitors price-fixing conspiracy.  *See United States v. Isawa et al.*, No. 4:15-cr-00163-JD (N.D. Cal. filed March 12, 2015).

74.    Panasonic was also charged by the Competition Commission of Singapore ("CCS") for "participating in anti-competitive agreements and/or concerted practices to fix prices and exchange information" in the capacitors market. Panasonic, along with other co-conspirators, was found to have "met regularly in Singapore and Japan from as early as 1997" to "exchange confidential and commercially sensitive information pertaining to their product pricing and agreements on various price increases."  That investigation began because of a leniency application by Panasonic.   It has also been reported that the CCS is cooperating and exchanging information with various other competition authorities, including those in the United States, China, the European Union, Japan, Korea, and Taiwan.

75.    Because passive electronic components are closely related, and Defendant companies all manufacture capacitors as well as Inductors, many of the same employees of Common Defendants who exercised managerial responsibility over capacitors and participated in the capacitors price-fixing conspiracy also exercised managerial responsibility over Inductors. Upon information and belief, many of these managers colluded, exchanged competitively sensitive information, and fixed prices of Inductors similarly to capacitors.

76.    For example, Tomohide Date of Common Defendant NEC TOKIN, who was criminally indicted in the capacitors price-fixing conspiracy, also exercised

managerial responsibility over Inductors at Common Defendant NEC TOKIN during the Class Period. *See United States v. Isawa et al.*, No. 4:15-cr-00163-JD at Dkt. No. 15 (indicting Mr. Date and other individuals for price-fixing in violation of Section 1 of the Sherman Act). Specifically, Mr. Date served as General Manager of NEC TOKIN's EMC Division and exercised responsibility and oversight as to sales and marketing of Inductors at Common Defendant NEC TOKIN during the Class Period.

77.     Panasonic has pled guilty of criminal price-fixing in several other industries, including switches for steering wheels, turn signals, and windshield wipers; automotive parts and battery cells; and refrigerator compressors.

78.     Defendant TDK is also under investigation in the United States and Japan for fixing prices on suspension parts for hard drives.

79.     Defendants Murata, TDK, and Taiyo Yuden declined to comment on whether they had received subpoenas regarding the Inductors investigation.

80.     Panasonic stated that it had not received a subpoena in the Inductors investigation. Given its history of leniency applications, it is reasonable to believe that Panasonic may be cooperating with antitrust authorities regarding the Inductors conspiracy.

**D.     <u>Trade Associations Furthered the Conspiracy.</u>**

81.     Defendants' conspiracy was effectuated, in part, through trade associations.  All of the Defendant company groups had an entity that is, or was during the Class Period, a member of the Japan Electronics and Information Technology Industries Association ("JEITA").  JEITA holds regular in-person meetings over the course of several days, including an annual conference.  JEITA events include social meetings such as dinners as well as formal meetings.

82.     The majority of the Defendants company groups had an entity that is or was during the Class Period, a member of JEITA's Electronic Parts Subcommittee,

and executives from TDK and Murata are the leaders of that subcommittee. These subcommittees, along with social events at JEITA meetings, provide ample opportunities for the Defendants to privately – and comfortably – meet and collude on pricing in the Inductors market.

83.    In fact, by no later than July 2014, JEITA's leadership also had become aware that its activities violated the antitrust laws. During that month, JEITA distributed a handout to its members, including Defendants, announcing an internal investigation into creating an antitrust compliance structure. In particular, the Electronic Components Working Group announced plans to investigate antitrust compliance issues arising from its activities.

84.    Defendants knew their collusive conduct and sharing of competitively sensitive information at these meetings were unlawful. Accordingly, upon information and belief, Defendants took efforts to conceal their collusion. In many instances, Defendants avoided creating, maintaining, or distributing official meeting minutes or records. Instead, Defendants used emails, summaries, and notes drafted by the employees who attended these meetings and limited internal distribution of those documents.

85.    In these communications, Defendants often attempted to conceal details of their collusive discussions and agreements by using coded language to identify the Defendant co-conspirators and their respective employees.

86.    United-States based subsidiary Defendants, such as Sumida America, TDK America, and Murata NA, as well as Panasonic subsidiary Panasonic Industrial Devices Sales Co. of America, are also members of the Electronic Components Industry Association ("ECIA"), which is located in the United States. As with JEITA, the ECIA regularly meets and provides ample opportunity for Defendants to conspire and exchange confidential information. One of the main purposes of ECIA is to share "unique industry data" such as sales reports for various

industries, including Inductors.  Murata NA, TDK America, and Panasonic are all on the "Passive Components Statistics Council" which gathers this confidential information.

The idea that JEITA and other trade association meetings are used for conspiratorial purposes is not just idle speculation.  It is well-known and has been publicly reported that JEITA meetings were instrumental to the continued price-fixing in the related capacitors market.  As with the capacitors price-fixing conspiracy, Defendants utilized these trade associations as a vehicle for their collusion in the Inductors market.

**E.      Defendants Furthered the Conspiracy Through Other Meetings.**

87.    In addition to in-person meetings, Defendants also engaged in multilateral and bilateral communications with each other and other co-conspirators in relation to and in furtherance of the Inductors price-fixing conspiracy during the Class Period. During and through these communications, Defendants exchanged competitively sensitive information with each other and other competitors in the Inductors industry, including but not limited to information about demand, pricing trends and targets, inventory, production capacity, capacity utilization, demand, and specific customers. During and through these communications, Defendants also formed, reached, participated in, and enforced agreements to fix, raise, maintain, and stabilize the price of Inductors at supra-competitve levels.

88.     Upon information and belief, Defendants exchanged competitively sensitive information and formed and reached anticompetitive agreements about Inductors at the same or similar meetings and social events and during the same or similar collusive communications where they exchanged similar information and formed and reached similar anticompetitive agreements about capacitors.

89.    Among other things, Defendants reached understandings and agreements to resist or limit Inductors price decreases and to raise, fix, and stabilize

Inductors prices at supra-competitive levels.

**F.    Defendants Strengthened Their Conspiracy by Interlocking Their Businesses.**

90.    Upon information and belief, during the Class Period, Defendant companies engaged in a pattern of acquiring and holding the shares of each other's companies and of other competitors, or cross-shareholding, in a practice known as "Kabushiki Mochiai."  By doing so, Defendants acquired a direct financial interest in ensuring the success and profitability of their competitors. Further, this practice of cross-shareholding represents more than shared financial interests between Defendants; rather, cross-shareholding is intended to, has, and does signify and solidify a strong relationship between corporations and significantly influences their business dealings.

91.    Upon information and belief, during the Class Period, Defendant companies, instead of competing against each other, formed business alliances, partnerships, and joint ventures with each other, through which they shared manufacturing know-how, intellectual property, and collaborated on sales with each other and other competitors.

92.    For example, in November 2014, Defendant Taiyo Yuden Co., Ltd. entered into an alliance agreement with its competitor ELNA, under which they agreed to and did collaborate on the supply procurement, development, and manufacturing of passive component products they both sold, shared technology and manufacturing know-how in their common passive component product segments, and collaborated on product sales of products they both sold.

93.    Also, in March 2012, Defendant Murata Ltd. and its then-competitor Defendant TOKO entered into a capital and business alliance under which they agreed to and did collaborate on the development, manufacture, and sale of Inductors and Inductor-related products.

94.     As another example, Defendant Taiyo Yuden stated that it holds certain stocks "for purposes other than net investment," specifically, to "maintain and strengthen transactional relationship[.]" For this stated purpose, Defendant Taiyo Yuden held about 105,000 shares, worth about ¥520 million, of Kyocera Corporation, which is the 70% majority owner of Defendant Taiyo Yuden's Inductors and capacitors competitor AVX Corporation. For this same stated purpose, Taiyo Yuden also held significant shares in its capacitors competitor Nichicon Corporation.

95.     In addition, Defendants have announced and confirmed their intent to collaborate and collude rather than compete with each other and other competitors, including on price competition.

96.     For example, Eiji Watanuki, President of Defendant Taiyo Yuden, stated to shareholders in the 2013 annual report that "we are transforming our business model to accommodate the formation of alliances with other companies. Looking ahead, we intend to proactively enter these markets characterized as being comparatively less susceptible to price competition."

**G.     The Inductors Market is Conductive to Price-Fixing.**

97.     The Inductors market demonstrates all the characteristics of a market that was ripe for collusive activity.

98.     Inductors are highly commodified products.  Inductors are typically marketed and sold primarily in accordance with their inductance values.  There is no great differentiation between Inductors so long as they produce the correct inductance.

99.     Defendants' own websites acknowledge the commodity nature of Inductors.  Defendant Taiyo Yuden has a "Cross Reference" page where a purchaser can search for Taiyo Yuden's Inductors by entering the product number of another company.  Defendant TDK maintains a similar webpage.  This shows that there is

no meaningful distinction between the products of the various Defendants; they are clearly interchangeable.

100.    Because of the commodity nature of this product, price increases would be difficult to institute and maintain without collusion.  In a competitive market, price increases could be quickly undercut by competitors who have comparable and easily-interchangeable parts.

101.    The Inductors market is also highly concentrated.  Defendants have a dominant global market share, and collusion among them quickly resulted in a dramatic rise in prices.  Although potential competitors such as the entry of China into newly non-tariffed markets in 2003 could have sparked competition and lower prices in an open market, no entity could hope to compete in the face of Defendant's combined market power once they agreed to cooperate.

102.    The effects of this market concentration were amplified by the actions of Defendants, including the aforementioned practice of "Kabushiki Mochiai," or acquiring and holding the shares of each other's companies, and by the consolidation of multiple companies such as KEMET and NEC Tokin, Panasonic and SANYO, and Murata and TOKO.

103.    There are significant barriers to entry in the Inductors market. Inductors are complex electronic components, and must be made to exact technical specifications using sophisticated and precise engineering methods.  Building factories to create a product such as Inductors requires a significant outlay of financial capital and the acquisition of personnel with substantial technical expertise.

104.    Moreover, as previously stated, the market was dominated throughout the Class Period by the Defendants – large, established companies who have the resources to benefit from economies of scale and who have established their reliability regarding the manufacture of these products.  A prospective entrant into

the industry would have to invest an enormous amount of money, and would be facing a long period of time before it could establish a customer base sufficient to gain any return on its investment.

105.   In fact, during the Class Period, there were no significant new entrants into the Inductors market, and there was instead consolidation in the industry as shown by the previously-described acquisitions of TOKO by Murata and EPCOS' Inductors business by TDK.  Accordingly, Defendants could be confident that, working together, they could use their dominant market share to control prices in the industry.

106.    There is also inelasticity of demand in the Inductors market.  There is no real substitute for Inductors.  Inductors, capacitors, and resistors, while all classified as "passive electronic components," perform different functions in electronic circuits, and in almost all applications cannot be substituted for one another.

107.    Inelastic demand is also supported by the fact that the prices of Inductors are relatively low compared to the end products they are integrated into, such as vehicles, computers, or military applications.  Under those circumstances, there is less incentive for a consumer who is manufacturing an end-product that contains an Inductor to seek an alternative solution, even in the face of rising prices.

108.   In general, an industry with such inelastic demand is more susceptible to price fixing.  Demand will not decline as much in the face of increased prices, and thus price-fixing conspiracies can raise and maintain pricing without losing sales.

109.   All of these market factors contributed to the effect of Defendant's price-fixing scheme: higher prices that purchasers, such as Plaintiff, were forced to pay.

## FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

110.   Throughout the Class Period, Defendants affirmatively and fraudulently concealed their unlawful conduct from discovery by Plaintiff.

111.   During the Class Period, Defendants provided purchasers and the public with pretextual excuses for pricing increases and decreases, output levels, and increases of production lead times. Defendants' pretextual justifications were intended to and did mislead purchasers about the real reasons for, among other things, long production lead times which limited supply.

112.   For example, certain Defendants have attempted during the Class Period to attribute price increases of Inductors purchased by Plaintiff to increases in raw material prices or labor costs.   But as indicated herein, raw material prices and labor costs were, in fact, static or declining.

113.   Upon information and belief, Defendants did not create, maintain, or distribute official records of the cartel meetings they held and attended in furtherance of the conspiracy, so as to maintain the secrecy of the conspiratorial conduct and of the conspiracy itself.

114.   Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, which it, in fact, exercised, the existence of the conspiracy and Defendants' and their co-conspirators' involvement in the conspiracy until January 4, 2018, when the DOJ's investigations first became public.

115.   Because the conspiracy was actively concealed until January 4, 2018, Plaintiff was unaware of Defendants' and their co-conspirators' unlawful conduct, and did not know that it was paying artificially high prices for Inductors.

116.   The affirmative acts of Defendants and their co-conspirators, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

117.   Defendants and their co-conspirators agreed among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal conspiracy.

118.   Defendants and their co-conspirators met and communicated secretly concerning the pricing and marketing of Inductors as to avoid detection.

119.   Plaintiff could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and secrecy techniques employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy, or combination. Defendants' conspiracy was fraudulently concealed by various means and methods, including, but not limited to, secret meetings, including meetings at trade associations such as JEITA, misrepresentations to customers, and surreptitious communications among Defendants in order to prevent the existence of written records.

120.   Because the alleged conspiracy was affirmatively concealed by Defendants and their co-conspirators until January 4, 2018, Plaintiff had no knowledge of the alleged conspiracy or any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed.

121.   None of the facts or information available to Plaintiff prior to January 4, 2018, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy.

122.   As a result of Defendants' and their co-conspirators' fraudulent concealment of the conspiracy, the running of any statute of limitations has been tolled with respect to Plaintiff's claims of anticompetitive conduct alleged in this Complaint.

1

## CLASS ACTION ALLEGATIONS

2      123.   Plaintiff brings this action on its own behalf and as a class action

3  pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on

4  behalf of the following Class (the "Class"):

5

6          All persons and entities that directly purchased inductors within
       the United States, its territories and the District of Columbia from any
7       Defendant or any predecessor, subsidiary or affiliate thereof, at any
       time between January 1, 2003 through the present. Excluded from the
8       class are governmental entities, Defendants, any parent, subsidiary or
       affiliate thereof, and Defendants' officers, directors, employees, and
9       immediate families.

10      124.   Plaintiff does not know the exact number of members of the Class

11  because such information is in the exclusive control of Defendants. Due to the

12  nature of the trade and commerce involved, however, Plaintiff believes that Class

13  members number at least in the thousands and are sufficiently numerous and

14  geographically dispersed throughout the United States, its territories and the District

15  of Columbia so that joinder of all Class members is impracticable.

16      125.   There are questions of law and fact which are common to the claims of

17  Plaintiff and the Class, including, but not limited to:

18          a.      Whether Defendants engaged in a combination or conspiracy

19  with their co-conspirators to fix, raise, maintain, and/or stabilize the prices for

20  Inductors;

21          b.      Whether the purpose and/or effect of the acts and omissions

22  alleged herein was to restrain trade, or to affect, fix, control, and/or maintain

23  the prices for Inductors;

24          c.      The existence and duration of the horizontal agreements alleged

25  herein to fix, raise, maintain, and/or stabilize the prices for Inductors;

26          d.      Whether Defendants violated Sections 1 and 3 of the Sherman

27  Act (15 U.S.C. §§ 1, 3);

28

e.    Whether Defendants' agents, officers, employees, or representatives participated in correspondence and meetings in furtherance of the illegal conspiracy alleged herein, and, if so, whether such agents, officers, employees, or representatives were acting within the scope of their authority and in furtherance of Defendants' business interests;

f.    Whether, and to what extent, the conduct of Defendants caused injury to Plaintiff and members of the Class, and, if so, the appropriate measure of damages; and

g.    Whether Plaintiff and members of the Class are entitled to injunctive relief to prevent the continuation or furtherance of the violation of Sections 1 and 3 of the Sherman Act.

126.   Plaintiff's claims are typical of the claims of the members of the Class.

127.   Plaintiff will fairly and adequately assert and protect the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class.

128.   Plaintiff is represented by counsel competent and experience in the prosecution of antitrust and class action litigation.

129.   The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

130.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy because:

a.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

b.    The Class is readily definable and one for which records should exist in the files of Defendants.

c.    Prosecution as a class action will eliminate the possibility of

repetitious litigation.

d.    Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would require.

e.    Class treatment will permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this complaint on an individual basis.

131.   This class action presents no difficulties of management that would preclude its maintenance as a class action.

<u>**COUNT I**</u>

<u>**VIOLATION OF THE SHERMAN ACT § 1**</u>

132.   Defendants and their co-conspirators entered into, and engaged in, a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

133.   Defendants' anticompetitive acts were intentionally directed at the United States Inductors market, and had a substantial and foreseeable effect on interstate commerce by raising and fixing Inductors prices throughout the United States.

134.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects upon commerce in the United States and upon import commerce:

a.    Prices charged to, and paid by, Plaintiff and members of the Class for Inductors were artificially raised, fixed, maintained, or stabilized at supra-competitive levels;

b.      Plaintiff and members of the Class were deprived of the benefits of free, open, and unrestricted competition in the United States Inductors market; and

c.      Competition in establishing the prices paid for Inductors has been unlawfully restrained, suppressed, or eliminated.

135.   Defendants' and their co-conspirators' anticompetitive activities have directly and proximately caused injury to Plaintiff and members of the Class in the United States.

136.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class paid artificially inflated prices for Inductors.

137.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class were damaged in their business or property by paying prices for Inductors that were higher than they would have been but for Defendants' unlawful conduct, which has resulted in an amount of ascertainable damages to be established at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court:

A.      That the Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be give to members of the Class;

B.      Adjudge and decree that Defendants' unlawful contract, combination, or conspiracy constitutes a per se violation of Section 1 of the Sherman Act;

C.      Adjudge and decree that each Defendant, and its successors, assigns, parents, subsidiaries, affiliates, and transferees, and their respective officers, directors, agents, and employees, and all other persons acting or claiming to act on behalf of any of them or in concert with them, be permanently enjoined and

restrained from in any manner, directly or indirectly, continuing, maintaining, or renewing the combination, conspiracy, agreement, understanding, or concert of action, or adopting any practice, plan, program, or design having a similar purpose or effect in restraining competition in the United States Inductors market;

    C.      Enter judgment against Defendants, jointly and severally, in favor of Plaintiff and the Class for treble damages determined to have been sustained by Plaintiff and the Class by virtue of Defendants' and their co-conspirators' violations of the Sherman Act;

    D.      Award Plaintiff and the Class their attorneys' fees, litigation expenses, and court costs, as well as pre-judgment and post-judgment interest as permitted by United States law; and

    E.      Grant Plaintiff and the Class such other and further relief as the case may require, or as the Court deems just and proper under the circumstances.

## JURY DEMAND

    Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury.

DATED: April 11, 2018            STUEVE, SIEGEL, HANSON LLP

                    By:  s/Jason S. Hartley
                        Jason S. Hartley
                        Jason M. Lindner
                        550 West C Street, Suite 1750
                        San Diego, CA 92101
                        Tel: 619-400-5822
                        Fax: 619-400-5832
                        hartley@stuevesiegel.com
                        lindner@stuevesiegel.com

                        Daniel Karon
                        KARON LLC
                        700 W. St. Clair Ave.
                        Suite. 200
                        Cleveland, Ohio 44113
                        (216) 622-1851
                        dkaron@karonllc.com

                        *Attorneys for Plaintiffs*